# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH OLAYER, on behalf of himself and
all others similarly situated,

      Plaintiff,

    vs.                         Civil Action No.: 2:13-cv-00753-JFC

TITEFLEX CORPORATION t/a GASTITE,

      Defendants.

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Joseph Olayer, by and through undersigned counsel, brings this action on his own behalf and on behalf of a Class of persons defined below against Defendant Titeflex Corporation ("Titeflex") and for his Complaint alleges, upon information and belief and based on the investigation to date of his counsel, as follows:

## NATURE OF THE ACTION

1.      This is a statewide class action brought by Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and on behalf of a Class of all similarly situated property owners, against Titeflex.  Titeflex manufactured, distributed, and supplied Gastite® corrugated stainless steel tubing ("CSST") throughout the United States, including Pennsylvania.

2.      CSST is an ultrathin, flexible piping used to transport natural gas within both residential and commercial structures.  It was developed as an alternative to the much thicker, more durable black iron pipe that has been used to transport gas within residential and commercial structures for more than a century.

3.     This action alleges that Titeflex improperly designed and manufactured Gastite®

and failed to properly test its resistance to lightning strikes.  Gastite's thin walls are susceptible

to perforation by an electrical arc generated by a lightning strike, which can cause and has

caused fires, damage to and destruction of residential structures, and creates a substantial and

unreasonable risk of death or personal injury.

4.     For instance, in Lubbock, Texas in August 2012, one person was killed and

another seriously injured when a lightning strike punctured the CSST in a house, instigating a

natural gas-fueled fire.  Fire and smoke damage affected the entire structure.

5.     It is well documented that Gastite® CSST can fail catastrophically in the presence

of lightning.  *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas*

*Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April

2011),                                           *available*                                           *at*

http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20

Report.pdf.  When the gas line becomes energized, the energy from the lightning strike passes

through it in search of a path to ground.  As it seeks a path to ground, the energy from the

lightning strike may jump off the CSST, usually through the air to another nearby conductive

material, in what is known as an arcing event.  The temperature generated by this lightning-

induced event is measured in thousands of degrees, which is easily hot enough to melt and

penetrate through the thin skin of the CSST, even though the arcs last only a fraction of a second.

When the gas line melts, gas inside is allowed to escape and is ignited by the melting event,

causing a gas-fueled fire.

6.     A 2005 expert reported prepared by Mark Goodson, a specialist in electrical and

mechanical failure analysis, concluded: "CSST fails when the CSST is contacted by electrical

current associated with lightning.  Due to its uniform design, all CSST fails in the same manner when insulted by lightning: electricity contacts the CSST, the CSST acts as a conduit for the electrical current, the electricity perforates the pipe and permits gas to escape.  During this process, there is ignition of the escaping gas.  This problem uniformly affects all CSST brands, in that the products have the same inherent design, thickness (or lack thereof) and physical properties."  Mark Goodson and Mark Hergenrether, "*The Causal Link Between Lightning Strikes, CSST, And Fire*," Fire and Arson Investigator (October 2005), available at http://goodsonengineering.com/wp-content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf

7.     After concluding that Gastite® was deficient, Titeflex developed FlashShield® in 2012, which purportedly contains all the features of Gastite®, plus a layer of metal mesh and two layers of semi-conductive polymer to "protect against potential arcing during lightning strikes by mitigating the potential damage to such system caused by electrical arcing." The presence of Gastite® in Plaintiff and Class Members' structures creates an unreasonable risk of fire due to lightning strikes.

## THE PARTIES

8.     Plaintiff Joseph Olayer is the owner of a house located at 110 Clearwater Drive, Ellwood City, Pennsylvania  16117, in which Gastite® CSST is used to service his gas appliances.  Plaintiff purchased his home in 2010.

9.     Plaintiff, on behalf of himself and all other persons and entities similarly situated, brings this action for and on behalf of the owners of all residential and commercial structures with Gastite®.  Gastite® is defective, should never have been sold, and needs to be removed and replaced from all structures.

10.      Defendant, Titeflex, Inc. is a corporation organized and existing under the laws of Massachusetts having its principal place of business and a headquarters located at 603 Hendee Street in Springfield, Massachusetts 01104.

11.      At all times relevant hereto, Titeflex was in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST under the brand name "Gastite®."

## JURISDICTION AND VENUE

12.      Between 2000 and the present, thousands of homes in Pennsylvania, perhaps tens of thousands, were constructed with CSST.  Titeflex has approximately 10% share of the CSST market.  It follows that thousands of homes in Pennsylvania were built with Gastite®.

13.      The average estimated cost of removing and replacing CSST with lead gas pipe in these homes is in excess of $3,000.00.

14.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction), in that (i) there is complete diversity (Plaintiff is a citizen of Pennsylvania and Defendant is incorporated in Massachusetts, and to the extent pertinent, maintains its principal place of business in Massachusetts, (ii) the amount in controversy exceeds  $5,000,000.00 (Five-Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff class.

15.      Venue lies in this District, pursuant to 28 U.S.C. § 1391, because Plaintiff resides in this Judicial District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Judicial District.  In addition, Defendant does business and/or transacts business in this Judicial District, and therefore is subject to personal jurisdiction in this Judicial District and resides here for venue purposes.

## FACTUAL BACKGROUND OF CSST

16.     CSST was initially developed in Japan during the early 1980's as a safe and effective gas distribution system that can withstand damages that can occur during earthquakes and other natural disasters.  CSST has been used in Japan and Europe since 1980, and was introduced in the USA in 1989.

17.     The history of CSST coverage in the USA started in 1983 from a research and development project sponsored by the Gas Research Institute.

18.     The initial standards were developed by the American Gas Association Laboratories and were designated in 1987 as AGA 1-87.

19.     The introduction of CSST into the United States was brought about by the firm Foster-Miller.  According to the The National Fire Protection Association, when CSST was first considered in 1988, lightning was given no consideration.

20.     CSST was first recognized by the National Fire Protection Association in the *Fuel Gas Code* NFPA 54 in 1988.  In 1989, the National Fuel Gas Code introduced coverage of CSST.

21.     The International Association of Plumbing and Mechanical Officials approved CSST for inclusion in its 2003 Uniform Plumbing Code which opened the doors for CSST in all 50 states.

22.     The CSST system consists of flexible pipe between the building gas source and appliances, as well as fittings and other accessories.  The flexibility of the tube allows it to be routed through the building in continuous lengths without the many joints required with rigid piping and without the need for any special tools.  The flexible gas piping market in the U.S. is currently concentrated in the residential housing market.

23.     There are approximately ten manufacturers of flexible metal hose in the United States.  The U.S. manufacturers include Omega Flex Corporation, Ward Manufacturing, Truflex, Microflex, U.S. Hose, Hose Master, and several smaller privately held companies.

24.     CSST is made from 300 series stainless steel and is more expensive than an equivalent length of iron pipe.

25.     According to industry experts, "CSST has revolutionized the gas-distribution business.  It is easy to use and this lowers the cost over the entire installation.  Back-breaking black iron pipe projects that demanded eight or 10 laborers can now be handled with ease by only one or two certified CSST installers – freeing up precious labor for other tasks that will keep projects moving forward.  Lightweight and flexible Gastite CSST will typically slash installation time by 50% or more."  Mary Jo Martin, "*In Less than Two Years, Gastite Establishes Strong Position in Market*," The Wholesaler (March 2009), available at http://www.thewholesaler.com/march_09/gastite_feature.php.

26.     The advantages of CSST over traditional black iron pipe also include lower overall installation costs because it can be installed in long uninterrupted lines within the building.

27.     As of March 2013, CSST commands slightly over one-half of the market for fuel gas piping in new and remodeled residential construction in the United States.  Rigid iron pipe, and to a lesser degree copper tubing, accounts for the remainder of the market.

28.     To date, over 750 million feet of CSST has been installed in over 5 million homes across the United States.  Omega Flex, *CSST vs. Black Iron Pipe*, CSST Facts (2013), available at http://www.csstfacts.org/csst-vs-black-iron-pipe.aspx.

## DANGERS OF LIGHTNING AND CSST

29.     CSST is likely to fail when exposed to electrical insult, particularly lightning.  *See* Mark Goodson and Mark Hergenrether, "*Lightning Induced CSST fires*" (August 2011), available at http://goodsonengineering.com/wp-content/uploads/2011/08/p379-Goodson-TB1140_web.pdf.  Gas piping systems are particularly susceptible to damage because they are a potential conductive path for lightning energy, and are likely to be routed near other metal utility lines inside the house.

30.     In an indirect lightning strike, a strike close to a structure or house generates a partial lightning current in the metal links of the building.  This electrical energy in attempting to reach ground may arc between metal systems that have different electrical resistance.  Arcing can cause damage to the metal systems.

31.     Damage caused by a direct or indirect lightning strike to a CSST system can be described as a small puncture of the tubing wall.  This type of damage is caused by an arc of energy "jumping" from a pathway of higher potential to a pathway of lower potential in an effort to find a lower impedance pathway to ground.  A puncture in the tubing wall can ignite the natural gas at the hole.  This gas can ignite surrounding materials and spread to create an extensive fire, resulting in significant damage to the house and destruction of all of the contents of the house.  This type of damage appears to be consistent around the country.

32.     In standard CSST systems, an electrical bond between the CSST and the building's grounding electrode *might* address this issue. Bonding is the process of making an electrical connection between the grounding electrode and any equipment, appliance or metal conductor.  Bonding of CSST to a common grounding electrode allows the energy to move at the same rate as the electrical system in unison with the energy wave.  The requirement for bonding

and grounding is very specific depending on the area's building codes.  Pennsylvania has the most stringent building codes and practices, including a requirement for bonding.   The provisions for grounding of the electrical system and bonding other metallic systems are contained in the National Electric Code (NEC NFPA 70) and the National Fuel Gas Code (NFGC NFPA 54).

33.     Even if all mechanical and electrical systems of the building are properly bonded, the risk of a CSST induced fire is still present.

34.     Even with code-compliant and manufacturer-recommended bonding, however, Gastite® is not immune to the risk of damage that can be caused by lightning.

35.     In fact, these codes are minimum standards that continue to be under review. Year after year, the standards continue to change, yet prior installations do not benefit from more stringent changes.

36.     An expert on gas piping opined that "CSST manufacturers give installers and building inspectors way too much lease in expecting them to do their jobs right.  Even when the job is 'done right,' there is still the opportunity for the CSST to become a conduit for lightning to ground.  Many installers believe that connecting their CSST to an electrical panel with a bond wire is acceptable, but what most do not realize is that a lot of electrical panels are not properly grounded to terra firma."  According to his professional opinion, "If you leave CSST in your building, then you are gambling or are just plain stupid." John Rocheleau, "*CSST Gas Pipe/Lightning Fires*," Protech HVAC (August 1, 2012), available at http://www.protechhvac.com/tag/csst/.

37.     Mark Goodson, an expert in electrical and mechanical failure analysis, has recommended the following three remediations to prevent CSST induced fires, including

complete removal of CSST from the structure:  "(1) convert the structure to electricity only and remove all gas delivery; (2) retain gas but remove all CSST from the structure and install black iron pipe; or (3) prevent lightning from contacting the CSST which would prevent perforation and ensuing fire – i.e., install a NFPA 780 type lightning arrestor system.  Without paying for the costs associated with one of these three solutions, homes or structures containing the CSST are subject to fire due to the uniform failure when electrical current caused by lightning contacts the CSST." Mark Goodson and Mark Hergenrether, "*The Causal Link Between Lightning Strikes, CSST, And Fire,*" Fire and Arson Investigator (October 2005), available at http://goodsonengineering.com/wp-content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf (emphasis added).

38.     The dangers resulting from CSST and lightning strikes have resulted in the Frisco, Texas Fire Department and the Arlington, Texas Fire Department seeking to ban CSST.

39.     As of  August 2011, 141 fires involving lightning and CSST have been reported throughout the United States.  *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), *available at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20Report.pdf.

## BACKGROUND OF TITEFLEX

40.     Titeflex is a global leader in creating and adapting fluid management products and quality programs.  The company has a long history in flexible fluid management products and rigid tube bending capabilities.

41.     The Gastite Division of Titeflex manufactures corrugated stainless steel gas piping for consumers' natural and propane gas needs.  The company manufactures flexible metal hose at its facility in Springfield, Massachusetts. The company offers its products through distributors in Orange Park and Miami, Pennsylvania; Irvine, California; and Copenhagen, Denmark.

42.     Recognized as a fuel gas piping material since 1988, Titeflex describes Gastite® as a "reliable, cost-effective system that can be installed in all modes of construction."

43.     In 2012, the Company developed FlashShield®, which "provides more layers of resistance than any other CSST, while eliminating additional manufacturer-required direct bonding."  It consists of a layer of metal mesh between two jackets of semi-conductive polymer. FlashShield® was a specific product developed to address the induced lightning concern.

44.     Upon information and belief, Gastite® was not designed to withstand the massive and unpredictable energy associated with an indirect lightning strike.

45.     Upon information and belief, Titeflex has known since at least 2004 that Gastite® is prone to damage or perforation when subjected to an electrical charge from an indirect or direct lightning strike.

46.     The multi-layered lightning-resistant system added to Titeflex's FlashShield® improves its ability to dissipate arcing energy, reducing the level as it moves downstream which helps to protect regulators, appliance connectors and other mechanical systems, all of which could result in the potential for fire.

47.     Based upon these subsequent improvements to Gastite®, Titeflex knew or should have known, prior to Plaintiff's installation of the Gastite® CSST in this case, that the CSST

presented an unreasonable risk of failure when subjected to energy from an indirect lightning strike.

48.     Despite this knowledge, Titeflex failed to sufficiently warn Plaintiff and the Class or their contractor or subcontractors of the unreasonable risk of failure of the CSST when subjected to energy from an indirect lightning strike.

## TITEFLEX FAILED TO ADEQUATELY TEST GASTITE

49.     An April 2011 study conducted by SEFTIM addresses the CSST failure scenario and suggests the need for significant testing in an effort to "mitigate" lightning related damage. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), *available                                                                                    at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf (the "Report").   The Report was issued by the Fire Protection Research Foundation, a group that consists of members of NFPA, the National Electrical Contractors Association, the U.S. Army, the New Mexico Institute of Technology, and three private engineering firms, among others. Significantly, the sponsors of the study included numerous CSST manufacturers.  The Report recognized the need to conduct numerous tests in an effort to reduce the hazards of the product.

50.     The Report provided numerous examples of CSST failure scenarios and attempted to offer solutions, which it also calls "mitigations," to address future CSST failure scenarios. The Report cautioned that merely bonding the CSST at its starting and/or ending point may not be sufficient and that "a global equipotential solution is necessary to achieve a complete solution." The "mitigations" would include the following possibilities if supported by testing:

11

multiple bonding, bonding with a short length of conductor, requiring minimum bends, requiring a separation distance from another metallic circuit (such as a chimney flue or cable), and a design change that would enhance the ability to withstand a lightning surge. The Report noted that some manufacturers already included some of these requirements in their prior "installation rules." But the Report cautioned: "However, based on some studied CSST cases, holes do not always occur where the distance between the CSST and a metallic part is the smallest, and thus separation distance may be difficult to address." It also cautioned that none of these potential solutions may actually work: testing was still needed to show that they will, in fact, work.

51. According to the Report, several tests of CSST had yet to be done. The recommended testing is summarized in the Conclusion section, as follows:

    a. "Simulations are needed to show if separation distance is needed based on bonding conductor length and possible lightning currents given from the standard database. Bonding conductors located at the entrance may not be enough if the bonding conductors are too long. In that case, multiple bonding or separation distance may solve the problem (please note that a few cases have shown that incidents occurred in spite of apparent sufficient separation distance)."

    b. "Tests should be made to check the ability of CSST to withstand small fault current for a long time, as well as higher fault current for a shorter time. It should be confirmed that multiple bonding is unlikely to create a major problem when surge current is flowing along CSST."

    c. "Tests should be performed to identify the impedance (mainly inductance) of CSST per unit measure."

    d. "Tests to determine CSST impedance should incorporate the maximum bending radius as given in technical brochures. The effect of bends should be investigated."

    e. "Tests should be performed with 8/20 impulses (representing induced surges) to see if this can damage CSST if multiple bonding is not provided."

These needed tests and simulations would allow CSST manufacturers to adequately determine if multiple bonding is necessary or not.

52. Based upon information and belief, Titeflex did not conduct these tests on Gastite. It did not test and to date has not tested the product adequately under actual installed conditions. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), *available                                                                                                    at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf (the "Report").

53. According to the Report, testing of CSST under actual installed conditions using transient waveforms can show further limitations that conventional bonding and grounding cannot accommodate.

54. Accordingly, Titeflex failed to test Gastite's ability to withstand such energy when bonded. Adequate testing would have revealed the serious deficiencies in Gastite® in that it would have solidified the knowledge of the link between Gastite® and natural gas fires resulting from lightning strikes.

## PREVIOUS LITIGATION INVOLVING GASTITE® AND CSST

55. Gastite® can fail catastrophically as a result of a direct or indirect lightning strike. This phenomenon explains why Gastite® has been the subject of one nationwide class action; why it has been banned in certain jurisdictions; why Titeflex offered a new and improved version of the product recently; and why the National Fire Protection Association, the publisher of the *National Fuel Gas Code,* has the product currently under review. There has been an increase in the frequency of litigation concerning Gastite® in the last few years.

56. A class-action lawsuit, *Lovelis, et al. v. Titeflex, et al*., Case No. Civ-2004-211 (Arkansas Circuit Court, Clark County) filed in Arkansas in 2004 against several manufacturers,

including Titeflex, claimed CSST posed an unreasonable risk of fire from lightning strikes, leading to a 2006 settlement.  Both Titeflex and the other defendants denied these allegations, and denied any wrongdoing or legal liability, but agreed to settle this matter to avoid further cost and the uncertainty and risk of the outcome of further litigation. Under the Settlement Agreement, Titeflex agreed to pay the value of each payment voucher redeemed by a class member for the installation of a lightning protection system or bonding and grounding of the company's CSST product. The settlement class involved "all persons and/or entities who own real property or structures in the United States in which CSST manufactured by the Settling Defendants was installed as of September 5, 2006."  It is unknown how many class members received this notice.

57.     In October 2010, the largest CSST manufacturer, Omega Flex, took the first case relating to CSST and lightning to trial, *Tincher v. Omega Flex, Inc.*, No. 2008-00974-CA (Pennsylvania, Chester Co. Com. Pleas, Oct. 20, 2010).   Terence and Judith Tincher, the plaintiffs, purchased a house that was plumbed with TracPipe® CSST in 1998.   During a thunderstorm in June 2007, a lightning strike energized the line beneath the first floor of the house. The resulting electrical arc created a hole in the piping, igniting natural gas. A large fire erupted, causing a structural collapse in the center of the house. The house and its contents were a total loss.  Following an eight day trial, the jury found CSST to be a defective product and imposed strict liability against Omega Flex. Omega Flex argued that a properly bonded CSST system could withstand the energy produced from an indirect lightning strike but Omega Flex's failure to ever test the CSST's ability to withstand such energy, when properly bonded, proved fatal to its defense.  At trial, expert testimony established that the CSST has substantially greater susceptibility to perforation by lightning-induced energy than does black iron pipe, rendering it

defective and posing a substantially greater fire hazard. The jury awarded 100% recovery of both the subrogated and uninsured losses, for a total judgment that exceeded $1,000,000.00.

58.     A case in the Middle District of Tennessee, *Konowitz et al. v. Titeflex Corporation,* No. 2:13-cv-00005 (M.D. Tenn. Jan. 22, 2013), is currently in the discovery stages. Plaintiffs have brought claims of negligence and product liability against Gastite after a lightning storm occurred near the Konowitz home and a fire burned the home down.

### REPRESENTATIVE PLAINTIFF JOSEPH OLAYER

59.     Plaintiff is the owner of a home located in Beaver County, Pennsylvania that has Gastite® manufactured by Titeflex installed in his home.

60.     Photos depict Plaintiff's Gastite® manufactured by Titeflex installed in his home:





61.     Plaintiff, like other members of the Class, did not change or alter Gastite® since the time it left Titeflex's control.

62.     Plaintiff and members of the Class have suffered damages as a result of Defendant's sale of defective products and their deceptive practices.  While Plaintiff and the Class are forced to repair and/or replace Gastite®, they have neither been reimbursed for or advanced the costs associated with this undertaking.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and a Class defined as follows:

> All persons in the State of Pennsylvania who purchased a house, or
> other structure, in which Titeflex's Gastite® is installed after

> September 5, 2006, or who, after September 5, 2006, purchased a
> house, or other structure, in which Titeflex's Gastite® was
> installed prior to September 5, 2006.

Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Titeflex and any entity in which Titeflex has a controlling interest or which has a controlling interest in Titeflex and its legal representatives, assigns and successors of Titeflex; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

64.     *Numerosity:* The Class is composed of thousands of persons in the State of Pennsylvania, the joinder of whom in one action is impractical.  Between 2000 and the present, thousands of homes in Pennsylvania, perhaps tens of thousands, were constructed with CSST. Titeflex has approximately 10% share of the CSST market.  It follows that thousands of homes in Pennsylvania were built with Gastite®.  Moreover, upon information and belief, the Class is ascertainable and identifiable from Titeflex's records or identifying marks on the CSST.

65.     *Commonality:* Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual issues include the following:

      a.   Whether Gastite® is inherently defective;

      b.   Whether Gastite® was in an unreasonably dangerous condition when it was manufactured and distributed;

      c.   Whether Gastite® was reasonably safe for its intended use as manufactured and designed;

      d.   Whether Titeflex knew or should have known of the defect;

      e.   Whether Titeflex concealed from consumers and/or failed to disclose to consumers the defect;

      f.   Whether Titeflex failed to provide adequate installation instructions;

g.   Whether Titeflex failed to adequately test for potential defects in Gastite®;

h.   Whether Titeflex failed to adequately warn of the foreseeable risks associated with using Gastite®;

i.   Whether Titeflex omitted critical information regarding defects in its product in its marketing, sales and installation materials;

j.   Whether Plaintiff and the Class are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Class for replacement of Gastite® and/or installation costs; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between Gastite® as warranted and Gastite® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in Gastite®;

k.   Whether Plaintiff and the Class are entitled to all costs associated with replacement of their defective Gastite® with non-defective CSST; and

l.   Whether Plaintiff and the Class are entitled to restitution and/or disgorgement.

66.   *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Titeflex's conduct in designing, manufacturing, marketing, advertising and selling the defective Gastite® and Titeflex's conduct in concealing the defect in the Gastite® to owners, contractors, developers, and suppliers.

67.   *Adequate Representation:* Plaintiff will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class.  Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions involving breach of warranties, product liability and product design defects.

68.   *Predominance and Superiority:* This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.   Should individual Class members be required to bring

separate actions, this Court and courts throughout Pennsylvania would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

**COUNT I**
**Strict Liability – Design and Manufacturing Defect**

69.     The allegations contained in paragraphs 1-68 are incorporated herein by reference as if fully set forth.

70.     At all times relevant hereto, Titeflex was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST piping, including the Gastite® CSST piping installed at Plaintiff and Class Members' houses.

71.     At all times relevant hereto, Gastite® was designed and placed into the stream of commerce by Titeflex.

72.     Titeflex designed, formulated, tested, manufactured, inspected, marketed, distributed, supplied and/or sold Gastite® that was defective in design and/or manufacture when the product left the hands of the Defendant.  The foreseeable risk from installing Gastite® exceeded any potential benefits associated with the design and/or manufacture of it.

73.     Gastite® manufactured by Titeflex was expected to and did reach Plaintiff and Class Members' houses without substantial change in the condition in which it was designed, manufactured, tested, inspected, distributed, marketed or sold.

74.     Ultimately, Gastite® designed, formulated, tested, manufactured, inspected, distributed, stored, marketed, supplied and/or sold by Titeflex was defective in design and/or

19

manufacture in that, when the product left the hands of the designers, manufacturers, distributors and/or suppliers, it was unreasonably dangerous, more dangerous than a houseowner would expect.

75.    Titeflex knew, or should have known, that at all times mentioned herein, Gastite® was inherently dangerous and unsafe because of its inability to adequately resist lightning strikes.

76.    Plaintiff and the Class, acting as reasonably prudent people, could not discover that Gastite® was defective as mentioned herein, or perceive its danger.

77.    At the time of use of Titeflex's Gastite®, Plaintiff and the Class utilized the piping for the purposes and manner normally intended.

78.    By reason of the foregoing, Titeflex is strictly liable in tort to Plaintiff and the Class for designing, manufacturing, testing, inspecting, distributing, marketing and/or selling Gastite®.

79.    Said defects in Gastite® were a substantial factor in causing Plaintiff and the Class damages and injuries and/or placing Plaintiff and the Class members at increased risk of damage and/or harm.

80.    As a direct, proximate, and foreseeable result of the defective condition of Gastite® as manufactured and sold by Titeflex, Plaintiff and the Class have suffered, and will continue to suffer, damages.

## COUNT II
### Negligence – Design Defect: Failure to Test

81.    The allegations contained in Paragraphs 1-80 are incorporated herein by reference as if fully set forth.

82.     Titeflex did not perform adequate testing on Gastite® that was defectively designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold to Plaintiff and the Class.

83.     Adequate testing would have revealed the serious deficiencies in the Defendant's Gastite® in that it would have solidified the knowledge of the link between Gastite and natural gas fires resulting from lightning strikes.

84.     Titeflex had and continues to have a duty to exercise reasonable care to properly design, including the duty to test, its Gastite® that it introduced into the stream of commerce, including a duty to ensure that Gastite® does not cause its users, including the Plaintiff and Class, to suffer from unreasonably dangerous results as a result of using it.

85.     Titeflex breached these duties by failing to exercise ordinary care in the design, specifically the testing of Gastite®, which it introduced into the stream of commerce, because Titeflex knew or should have known that Gastite® created an unreasonable risk of fire and danger, and failed to do the appropriate testing.

86.     Titeflex knew or should have known that consumers such as Plaintiff would foreseeably suffer economic damages or injury, and/or be at an increased risk of suffering damage and injury, as a result of its failure to exercise ordinary care in the design of the product by failing to do the appropriate testing.

87.     By reason of the foregoing, Plaintiff and the Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as financial damage and injury.

88.     As a direct and proximate result of the Defendant's failure to test Gastite® designed, formulated, manufactured, inspected, distributed, marketed, warranted, advertised, supplied and/or sold by the Defendant, Plaintiff and the Class has suffered damages.

## COUNT III
## Negligence – Failure to Warn

89.     The allegations contained in Paragraphs 1-88 are incorporated herein by reference as if fully set forth.

90.     At all times mentioned herein, Titeflex designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold Gastite® to Plaintiff and the Class.

91.     At all times material hereto, the use of Gastite® in a manner that was intended and/or reasonably foreseeable by Titeflex involved substantial danger that would not be readily recognized by an ordinary user of Gastite®.

92.     At all times material hereto, this danger was known or knowable by the Titeflex, in light of the generally recognized and prevailing knowledge available at the time of manufacture and design, as described herein.

93.     Titeflex, as the manufacturer of Gastite®, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use.

94.     Titeflex was negligent and breached its duty of care by negligently failing to give adequate warnings to purchasers and users of Gastite®, including Plaintiff, about the unreasonably dangerous and defective condition of Gastite®, the likelihood of CSST-induced fires, and the substantial and unreasonable risk of death or personal injury Gastite® creates.

95.     Titeflex failed to exercise reasonable care in their design, marketing, and sales so as to inform Plaintiff and the Class the dangers inherent associated with using Gastite® in their structures.  Titeflex failed to adequately warn Plaintiff of any dangers.

96.     Titeflex knew, or by the exercise of reasonable care, should have known of the inherent design defects and resulting dangers associated with using Gastite®, and knew that

Plaintiff and/or the Class could not reasonably ascertain these dangers. Notwithstanding, Titeflex failed to exercise reasonable care in providing consumers with adequate warnings.

97.     Despite the fact that Titeflex knew or should have known that Gastite® was associated with and/or could cause natural-gas fed fires and creates a substantial and unreasonable risk of death or personal injury, Titeflex continued to market, manufacture, distribute and/or sell Gastite® to consumers, including Plaintiff and the Class.

98.     As a direct and proximate result of Titeflex's failure to adequately warn consumers of the dangerous properties of using Gastite® in their structures, Plaintiff and the Class has suffered damages as set out herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and on behalf of all others similarly situated, prays for a judgment against Titeflex as follows:

1.      For an order certifying the Class, pursuant to Rule 23, appointing Plaintiff as representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class;

2.      For compensatory damages sustained by Plaintiff and the Class;

3.      An award of costs as allowed by law;

4.      For both pre-judgment and post-judgment interest on any amounts awarded;

5.      For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

6.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

This the 24th day of July, 2013.

Respectfully submitted:

By: */s/ D. Aaron Rihn, Esquire*
D. AARON RIHN, ESQUIRE
Pa. I.D. No.: 85752
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street
Pittsburgh, PA 15219
Telephone: (866) 273-1941
Facsimile: (412) 281-4229

Robert B. Brown III (to be admitted *pro hac vice*)
WHITFIELD BRYSON & MASON LLP
3132 Ponce De Leon Blvd.
Coral Gables, FL 33134
Telephone: (305) 441-0440
Facsimile: (919) 600-5035

Gary E. Mason (to be admitted *pro hac vice*)
WHITFIELD BRYSON & MASON LLP
1625 Massachusetts Ave., NW
Suite 605
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

Daniel K. Bryson (to be admitted *pro hac vice*)
Scott C. Harris (to be admitted *pro hac vice*)
WHITFIELD BRYSON & MASON LLP
900 W. Morgan St.
Raleigh, NC 27603
Telephone: (919) 600-5002
Facsimile: (919) 600-5035

Scott W. Weinstein
(to be admitted *pro hac vice*)
MORGAN & MORGAN, P.A.
12800 University Drive
Suite 600
Fort Myers, FL 33907
Telephone: (239) 432-6666
Facsimile: (239) 822-8830

Charles J. LaDuca (to be admitted *pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

Joseph S. Bellissimo, Esq.
BELLISSIMO & PEIRCE
120 Fourth Street
Ellwood City, PA 16117
Telephone: (724) 758-5544

Sandra Cuneo (to be admitted *pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
11620 Wilshire Boulevard, Suite 900
Los Angeles, CA 90025
Telephone: (310) 582-5939
Facsimile: (310) 582-5943